UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TOUCHPOINT SOLUTIONS, INC.,
    Plaintiff,

v.

EASTMAN KODAK COMPANY,
    Defendant

Civil Action No. 04-11014-NMG

## PLAINTIFF TOUCHPOINT SOLUTIONS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR EXPEDITED DISCOVERY

Plaintiff TouchPoint Solutions, Inc. ("TouchPoint") respectfully submits this memorandum in support of its application for an Order, pursuant to FED. R. CIV. P. 26, 30 and 34, permitting expedited discovery in this action in aid of its Application for a Preliminary Injunction. Specifically, TouchPoint requests an Order requiring Defendant Eastman Kodak Company ("Kodak") to respond on an accelerated basis to TouchPoint's First Requests for Production of Documents and First Set of Interrogatories, and to produce witnesses promptly for depositions.[1]

TouchPoint filed this action on May 19, 2004, after a sequence of events which commenced with Kodak informing TouchPoint that they would not execute the fully drafted and agreed upon Master Software License Agreement after one and a half year of TouchPoints' configuring and designing remote management software for Kodak's digital photo kiosks. As set forth in more detail below, Kodak then revealed to TouchPoint that it had supplied TouchPoint's design, features, functions, concepts, confidential software, architecture and related trade secrets

---

[1] TouchPoint has filed simultaneously herewith an Application for a Preliminary Injunction. TouchPoint seeks to expedite discovery so that it may prove its entitlement to preliminary injunctive relief on a more fully developed record. A proposed Order with a discovery schedule is attached to the Motion for Expedited Discovery

to a competing vendor (IBM) and other suppliers despite the agreed upon confidentiality and exclusivity for the project. TouchPoint filed, but did not serve the Complaint, and requested a meeting of executives in an attempt to resolve the dispute. Shortly thereafter, TouchPoint and Kodak agreed to a meeting of their senior executives in an attempt to resolve the dispute. Kodak agreed that it would not pursue the development or integration of remote management software with its product during these discussions. TouchPoint did everything in its power to exert a good faith effort to resolve the dispute. Despite these efforts, the dispute was not resolved.

TouchPoint's trade secrets have been and continue to be disclosed to its competitors, such as IBM, and also are being used internally by Kodak's own development teams. Prior to discovery, it is not possible to enumerate each and ever item of information misappropriated and misused by Kodak. However, as a result of Kodak's consistent scheme to take TouchPoint's technology and build TouchPoint's product at a fraction of the cost based on TouchPoint's design, architecture and confidential software and related trade secrets, TouchPoint understands Kodak is in fact pursuing the development and integration of remote management software and continues to use and disclose TouchPoint's confidential information and trade secrets both internally and externally. By this motion, TouchPoint seeks expedited discovery so that it may document its entitlement to preliminary injunctive relief on a more fully developed record and in time to obtain meaningful relief.

## II. ARGUMENT

### A. Factual Background[2]

Catapult is TouchPoints remote management software for various hardware and intelligent devices. TouchPoint owns all rights, title and interest to the Catapult operating system, source code, software and sublicensing agreements, together with copyrights, and

---

[2] The facts set forth in this section are supported by the Affidavit of Anila Jobanputra.

2

additional licensing rights. Through end user agreements, TouchPoint controls the right of all Catapult users to use and distribute this software and prohibits any reverse engineering. These restrictions on the use and distribution through the license agreement are designed to protect TouchPoint's proprietary rights and the economic value of Catapult. No other Remote Management Software in the market currently provides the total integrated solution for remote management of intelligent devices that Catapult provides.

At the Photo Marketing Show in Las Vegas in March, 2003, Kodak initiated discussions with TouchPoint about providing Catapult for Kodak's digital photo kiosks. As a result, in April, 2003, the parties executed Kodak's form Confidential Disclosure Agreement. Shortly thereafter, Kodak advised TouchPoint that they were in the final stages of assessing the capabilities of a variety of providers and that each provider was required to respond to a requirements document. That requirements document was a short, vanilla explanation of Kodak's perceived requirements and also illustrated Kodak's minimal involvement, knowledge and understanding of remote device management and the required product. It became clear that Catapult would greatly exceed and, in fact, enhance Kodak's market offering significantly by including numerous advantages for the operation of these devices. Kodak recognized the clear strengths of TouchPoint's offering and requested TouchPoint to demonstrate Catapult on the Kodak Picture Maker kiosk.

During May and June, 2003, TouchPoint commenced a series of presentations of TouchPoint's product and designs, including technical discussions, disclosures and interoperability tests which required TouchPoint to custom configure its software to run in conjunction with Kodak's digital photo kiosk. Kodak responded that TouchPoint made a "positive impression" with the success of the test results which demonstrated the uniqueness of

the software functionality and invited TouchPoint to Rochester for a business discussion in their offices.

In July, 2003, Kodak learned that TouchPoint had successfully entered into a contractual relationship with Staples Canada for delivery of QuickPix, Touchpoint's digital photo solution powered by Catapult[3] Staples has thousands of stores across North America and required a self-serve solution that would operate on an integrated platform for scalability, remote management, content delivery, reporting, payment processing, and uniformity. TouchPoint's QuickPix solution with the Catapult back end fulfills reliably Staples' enterprise requirements. Recognizing the potential and the possibility of a strategic relationship, the parties entered into discussions and executed a Non-Circumvent Agreement pursuant to which TouchPoint would and did assist Kodak with its marketing at Staples. Staples had previously rejected Kodak as a supplier, but based on TouchPoint's proposed role, Kodak was brought back by Staples to sell Kodak's printers and continuous supply of photo paper.

At the same time, Kodak commenced discussions with TouchPoint on pricing for a license and implementation of its software. TouchPoint was further requested to provide demonstrations of the software to Kodak's business decision group, sales and marketing group and its service and support group.

Concurrently, Kodak approached TouchPoint to conduct a live pilot for Kodak's customers that required additional effort to custom configure its product. TouchPoint agreed to facilitate Kodak's need and allocated technical resources for another round of integration of Catapult with the Kodak Picture Maker kiosks. TouchPoint and Kodak also discussed and agreed to enter into a pilot arrangement. After a series of discussions with executives in both

---

[3] Digital photo kiosks are installed in numerous retail stores as well as in shopping centers. Kodak currently has 40,000 kiosks installed.

4

organizations, including legal counsel, a Pilot Agreement was drafted. However, in what would become a common reoccurrence during their relationship with Kodak, after the Agreement was drafted and TouchPoint had committed to this project, Kodak convinced TouchPoint through series of phone calls that Kodak did not have the funds to pay for the pilot and, furthermore, Kodak would only have a very limited number of resources for the pilot activity, however this would be a huge opportunity for TouchPoint and in good faith TouchPoint's effort would be highly recognized since Kodak was fully committed and believed in TouchPoint's product and capabilities. In good faith and based on Kodak's verbal commitments, a pilot program was hosted, implemented and paid for by TouchPoint.

The pilot consisted of TouchPoint's remote management software operating on its server in conjunction with Kodak's digital photo kiosks in Eckerd Drug Stores in the Atlanta, Georgia area. (Kodak's product development group for the digital photo kiosk business is located in Atlanta). For the pilot, TouchPoint developed a complete custom build of its remote management product specifically for Kodak. Notably, with the absence of the Pilot Agreement at Kodak's request, Kodak represented that it would dedicate a person to govern and ensure that the confidentiality of TouchPoint's information be preserved and that there would be no contamination of Kodak's internal development group which had been working on a different approach and more limited application.

In October, 2003, TouchPoint was informed that Kodak had gone through restructuring and the key participants who where involved with TouchPoint since April, 2003 would be replaced by new teams.

In November, 2003, following what Kodak stated was a successful pilot which further proved the Catapult software enhanced functionality, TouchPoint initiated discussions on

5

implementation, deployment and pricing with Kodak's commercialization group. TouchPoint stressed the confidentiality of the information being provided and confirmed with Kodak that it would be treated with the greatest sensitivity. TouchPoint further stated that unless there was a business case for the implementation of the product that they should not continue. Kodak repeatedly confirmed that the pilot had been successful and that there was a commercial and business case for the product. This led to business and pricing negotiations during November and December.

On December 22, 2003, the parties agreed and confirmed by e-mail the business terms in a letter of intent for the pricing and related terms and details, including deployment, implementation and exclusivity. In early January, 2004, the parties then commenced the drafting of a Master Software License Agreement and a Master Professional Services Agreement. At the same time, Kodak also requested that TouchPoint provide technical assistance in creating a detailed Product Requirements Document ("PRD") that was based on TouchPoint's software and would define the product requirements for TouchPoint's software. Kodak assigned various groups within their organization to commence this process. This PRD document was expressly stamped and protected under the confidentiality agreement. Kodak requested that the detailed integration, implementation and customization proceed immediately so the product could be deployed in May, 2004.

In turn, TouchPoint requested payment for the work, as it had been paid nothing to date. These discussions resulted in an agreement that the documentation of the agreements would proceed concurrently with the necessary work and payment included in the Services Agreement. Consequently, while the agreements were being reduced to writing, the parties commenced the more detailed technical discussions and meetings. Those exchanges included periodic face-to-

face large group meetings of the technical teams at both parties' locations and daily conference calls between the technical, service, security, sales and marketing teams and continued throughout January, February, March and into April, 2004. During these meetings, TouchPoint disclosed the features, functions, marketing, operations and architecture of both its custom built product and the new, planned versions of its product.

On March 19, 2004 the parties confirmed by e-mail that the terms of the Master Professional Services Agreement ("Services Agreement") and two related Purchase Orders for various implementation services for TouchPoint's software were final. On March 22, 2004 Kodak then executed the Master Professional Services Agreement and signed documents were exchanged. The sole function of the Services Agreement and Purchase Orders was in conjunction with and as additional support for the software to be provided under the License Agreement. On March 25, 2004, Kodak accepted the terms of the Master Software License Agreement by e-mail.

Throughout this period, Kodak deliberately insisted that TouchPoint keep the technical teams engaged and continued to discuss the detailed terms for implementation of the software. Over the course of all the activities relating to TouchPoint's software that required continuous technical and developmental demands by Kodak, TouchPoint exposed highly sensitive information that included full access via password to TouchPoint's server.

TouchPoint at its own cost had provided Kodak a dedicated server at a remote third party hosting facility, subject to the terms and conditions of Catapult's software licensing agreement. TouchPoint's server access log indicates that Kodak's Pilot group, as well as its advance development group, commercialization group and product development group for its own in-house product development branch, routinely accessed the server. TouchPoint understands that

Kodak accessed TouchPoint's server not only to demonstrate TouchPoint's product to Kodak's customers but also to TouchPoint's competitors and customers and to Kodak's employees who were not part of the established teams. Kodak also used its access to pull proprietary framework, methodology, functionality, ideas and scripts of TouchPoint's product from the server and, on information and belief, built these features into its own internal software development applications.

In the last week of March, 2004 Kodak increased its demands and created urgency that TouchPoint also provide its detailed encryption procedure, configuration, samples and user guide to Kodak. TouchPoint now understands that Kodak had no intention whatsoever to proceed with their relationship with Touchpoint at this time.

In early April, 2004, on the eve of what TouchPoint understood to be the execution of the Master Software License Agreement, and unaware of Kodak's double-dealing, Kodak requested and received some of the most sensitive, detailed information concerning TouchPoint's software. This included several technical walkthroughs from a system and development perspective on installation, authentication, licensing, communication methodologies, distribution, grouping, self-configuration, alert mechanisms, security, reporting, hosting, support, event handling, anti-virus integration, connection management, and server architecture.

On April 8, 2004, Kodak suddenly informed TouchPoint that the License Agreement – whose terms had been accepted in December, 2004 – was not feasible. On April 13, 2004 TouchPoint was also informed that Kodak had made a decision to enter into an agreement with IBM for a significantly lower price for remote management software. Kodak stated that it had been in discussions with IBM for several months (despite the declared exclusivity with TouchPoint) and was scheduled to meet with IBM to finalize the contract later that week.

Contrary to its earlier representations to TouchPoint, Kodak was not looking to TouchPoint as its sole provider of a remote management software solution. Unbeknownst to TouchPoint, and concealed by Kodak, Kodak had at least one other competing software product they were in discussion with in the background with the involvement of the same commercialization and technical group. TouchPoint then learned that Kodak had provided to IBM the Confidential Requirements Document which was constructed based on the details of TouchPoint's product based on the pilot activity. There was only one clear and significant change from the previous Requirements Document that TouchPoint had helped construct – and that was the absence of the Confidentiality legend referencing the confidentiality agreement between TouchPoint and Kodak. Otherwise, the document was identical. Through its own personnel working with TouchPoint at the product development level, Kodak was able to extract key information that no competitor would ever have been given, thus secretly and improperly enhancing Kodak's competitive edge. At no time during the negotiations, did Kodak reveal that it had been working with a competitor. Indeed, not only did Kodak fail to reveal these material facts, it took steps to actively conceal them from TouchPoint. TouchPoint believes that additional documents and detail containing Touchpoint's confidential information also was disclosed.

Finally, TouchPoint now understands that, since the unsuccessful settlement discussions, Kodak continues to develop a competing product internally and is attempting to integrate this product with other vendors by improperly using TouchPoint's confidential information and trade secrets.

### B. Expedited Discovery Is Necessary To Protect TouchPoint's Proprietary Information.

The Federal Rules of Civil Procedure and the relevant authorities grant the district courts broad powers to permit expedited discovery in circumstances like those here. 28 U.S.C. § 1657(a) provides that "the court shall expedite the consideration of any action ... for ... preliminary injunctive relief ...." In addition, FED. R. CIV. P. 26(d) specifically authorizes the Court to allow discovery on an expedited basis. *See* FED. R. CIV. P. 26(d) 1993 Advisory Committee Note (order providing for expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction").

Expedited discovery is recognized as a necessary means for ensuring timely and just determination of a dispute where the pace of normal pretrial procedures will prejudice a party. Obviously, delay here favors Kodak and would allow it to continue and further its breaches of the Confidentiality Agreement by disclosing TouchPoint's proprietary business information to TouchPoint's competitors. There can be no question that such conduct would result in further prejudice to TouchPoint. For these reasons, courts in this Circuit have routinely granted expedited discovery and held a hearing within a short time frame in litigation concerning theft of trade secrets, breaches of confidentiality agreements and misrepresentations. *See, e.g., Knapp Schenck & Co. Ins. Agency, Inc. v. Lancer Mgmt. Co., Inc.*, Civ. A. No. 02-12118-DPW, 2004 WL 57086, at *3 (D. Mass. Jan. 13, 2004) (Woodlock, J.) (expedited discovery allowed in a case involving the unlawful use of confidential proprietary and trade secret information acquired during sale negotiations between the parties); *Thermo Web Sys., Inc. v. Beebe*, Civ. A. No. 00-40170-NMG, 2001 WL 311295, at *1 (D. Mass. Mar. 15, 2001) (Gorton, J.) (Expedited discovery allowed in a case involving, among other claims, misappropriation of trade secrets and unfair competition).

Expedited discovery will pose little hardship for Kodak. The schedule proposed by TouchPoint, which is attached as Exhibit A to TouchPoint's Motion, is both reasonable and necessary. This schedule calls for document production and interrogatory responses within ten (10) days of service of the granting of the Order, and depositions for a period of twenty-one (21) days thereafter. Kodak has been on notice of the issues in this case since May, 2004. The parties have had a lengthy meeting between senior executives and numerous discussions between counsel. Kodak has had the opportunity to explore the issues internally at length and to prepare its documents and defenses. Given the scope of the issues presented here, this schedule is not burdensome, especially since the discovery sought by TouchPoint is focused on the central issue in the case: whether Kodak breached the Confidentiality Agreement with TouchPoint and improperly used TouchPoint's trade secrets by disclosing those secrets to third parties and/or is using those internally. Moreover, the order is reciprocal, allowing Kodak to obtain discovery from TouchPoint in the same manner.

Expedited discovery will permit TouchPoint to expose promptly the extent of Kodak's wrongful conduct, without the passage of critical time during which the imminent and irreparable harm to TouchPoint's business would mount. Expedited discovery will not only protect the proprietary and intellectual property interests of TouchPoint, but will also serve the interests of all parties and justice by moving forward toward a speedy resolution of the matter. Finally, counsel for TouchPoint will cooperate with Kodak's counsel to accommodate any reasonable request as to the scheduling and place of depositions.

## III. CONCLUSION

For these reasons, we respectfully request that the Court grant TouchPoint's application for expedited discovery.

Respectfully submitted,

TOUCHPOINT SOLUTIONS, INC.,

By its attorneys,

_____
H. Joseph Hameline, BBO #218710
Geri L. Haight, BBO #638185
Mintz, Levin, Cohn, Ferris,
   Glovsky & Popeo, P.C.
One Financial Center
Boston, MA 02111
617-542-6000

Dated: August __, 2004

### CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of August, 2004, I caused the foregoing *Plaintiff TouchPoint Solutions, Inc.'s Memorandum of Law In Support of Its Motion for Expedited Discovery* to be served by hand on the following:

Nicholas G. Papastavros, Esquire
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110

_____
H. Joseph Hameline

LIT 1473995v4