UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TOUCHPOINT SOLUTIONS, INC.,

Plaintiff,

- vs -                                        04-11014 NMG

EASTMAN KODAK COMPANY,

Defendant.

**DEFENDANT EASTMAN KODAK COMPANY'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION TO TRANSFER VENUE OR, IN THE ALTERNATIVE,
ITS MOTION TO DISMISS COUNTS I, III AND IV OF THE COMPLAINT**

**PRELIMINARY STATEMENT**

This dispute arose out of an unsuccessful effort by two sophisticated companies to enter

into a software license agreement. Following extensive discussions and negotiations, Eastman

Kodak Company ("Kodak") decided not to enter into a proposed license agreement with

TouchPoint Solutions, Inc. ("TouchPoint"). Kodak was entitled to decide whether to enter into

that agreement, and had every right to decide not to. Having been frustrated in its attempts to

become a Kodak supplier, TouchPoint now seeks to obtain through litigation the benefits of the

license agreement Kodak had declined to enter.

TouchPoint has brought this action in a district that has no connection with this dispute

and on the basis of claims that are baseless. At a minimum, three of the counts asserted in the

complaint do not even state a claim on which relief can be granted.

Accordingly, for the reasons set forth below, Kodak seeks the transfer of this action to

the Western District of New York, where many of the witnesses to this dispute reside and where

many of the relevant events occurred. In the alternative, Kodak seeks dismissal pursuant to Rule

12(b)(6) of TouchPoint's claims for breach of a TouchPoint-Kodak nondisclosure agreement, breach of the implied covenant of good faith, and for fraud.

## FACTS

### A.     <u>Background to the Dispute</u>

This is a dispute between Kodak, which is headquartered in Rochester, New York, and TouchPoint, which is headquartered in Toronto, Canada. (August 11, 2004 Affidavit of Thomas A. Pinkham ("Pinkham Aff."), ¶¶ 1, 8).

Kodak sells Kodak "photo kiosks". The kiosks are located in various drug stores, grocery stores, and other retail outlets throughout the world. The kiosks print photographs for customers. For some time prior to its dealings with TouchPoint, Kodak had been interested in the possibility of managing the kiosks remotely, using software that would both monitor the kiosks, and identify and help solve maintenance and other operational issues. Kodak hoped that such remote monitoring would improve the kiosks' profitability. (Pinkham Aff. ¶¶ 2-3).

In early 2003, TouchPoint approached Kodak regarding using TouchPoint software for remote monitoring and management of Kodak kiosks. (Pinkham Aff. ¶ 4). Following TouchPoint's initial contact, TouchPoint and Kodak explored the possibility of TouchPoint being able to provide suitable software support – at an appropriate price point – for Kodak's photo kiosks. There were frequent contacts between Kodak and TouchPoint representatives. TouchPoint representatives involved in this project worked out of TouchPoint's Toronto, Canada headquarters. Virtually all of the Kodak employees involved in this project were – and are – located in Rochester, New York. Several other Kodak employees who were involved with this project were located in Kodak's Atlanta, Georgia offices. (Pinkham Aff. ¶¶ 5, 7, 8).

- 3 -

During the course of the Kodak/TouchPoint discussions and negotiations, there were a number of in-person meetings between Kodak and TouchPoint representatives. Those meetings occurred primarily in Rochester and Toronto. (Pinkham Aff. ¶ 9).

Early on during their discussions, TouchPoint and Kodak entered into a Confidential Disclosure Agreement ("CDA"). (Complaint ¶ 7). [1] The CDA was executed on behalf of Kodak by Kent McNeley, who was a Kodak general manager and vice president located in Rochester, New York. (Pinkham Aff. ¶ 9). (A copy of the CDA is attached as Exhibit A to the Pinkham Aff.). The CDA was executed on behalf of TouchPoint by TouchPoint's president, Anila Jobantura. As indicated in the agreement, she was located at TouchPoint's Toronto headquarters. The CDA expressly provided that it was "made under and shall be construed according to the laws … of the State of New York". (CDA ¶ 17).

In late March 2003, Kodak and TouchPoint also entered into a Professional Services Agreement ("PSA"). (Complaint ¶¶ 12-13). (A copy of the PSA is attached as Exhibit B to the Pinkham Aff.). As with the CDA, the PSA provided that New York State law would govern. (PSA, Appendix B, ¶ 18). The PSA had a notice provision, providing that any notices required under the agreement would be provided to Kodak in Rochester, New York and to TouchPoint at its Toronto headquarters. (PSA ¶ 19.0). The PSA was executed by Ms. Jobanputra (the TouchPoint president located in Toronto), and John Metzger, Kodak's worldwide commodity manager, who lives and works in Rochester, New York. (Pinkham Aff. ¶ 10).

TouchPoint and Kodak prepared various drafts of a possible license agreement. The drafts provided for New York law to apply, and contained notice provisions with Rochester, New York addresses for notice to Kodak and a Mississuaga, Ontario Canada address for TouchPoint.

---

[1]     The written agreements referred to in the complaint may properly be considered on this Rule 12(b)(6) motion. Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

(Mississauga is a Toronto suburb). (A copy of a draft license agreement is attached as Exhibit C to the Pinkham Aff. The draft notice provision and choice of law provisions are at ¶¶ 14 and 16.5).

Kodak ultimately concluded that the benefits that might be realized by implementing the TouchPoint software system in connection with the kiosks would not support the proposed costs of licensing that software from TouchPoint. Accordingly, Kodak did not enter into the license agreement that the parties had drafted. The final Kodak decision maker regarding TouchPoint was Kent McNeley. He is no longer employed by Kodak, but still resides in Rochester, New York. (Pinkham Aff. ¶ 6).

There were no activities within the District of Massachusetts in connection with any of the events that gave rise to this dispute. None of the Kodak employees involved in this matter reside in Massachusetts, and Kodak is unaware of any TouchPoint employees involved in this matter who reside within the District of Massachusetts. (Pinkham Aff. ¶¶ 10-12).

**B.    This Action**

TouchPoint responded to Kodak's decision not to enter the proposed license agreement by bringing this action. At its core, the complaint seeks to obtain for TouchPoint the benefits it might have realized if Kodak had entered into the license agreement proposed by TouchPoint.

TouchPoint chose to bring this action in this Court, even though the only apparent connection between this district and this dispute is the location of TouchPoint's able counsel's office.

The TouchPoint complaint is a curious pleading. It claims that Kodak breached the CDA by "disclosing" TouchPoint trade secrets (Count I), but nowhere alleges that TouchPoint satisfied that agreement's condition precedent, which required TouchPoint to designate in

writing as "confidential" any information it wanted Kodak to protect. The complaint claims a breach of the implied covenant of good faith, apparently also based on allegations of Kodak misuse of TouchPoint information (Count III), even though such a claim requires the Court to rewrite the terms of the CDA, which it cannot do. The complaint asserts a claim for fraud, but makes no effort to plead that claim with the particularity required by Rule 9(b). It also asserts claims for promissory estoppel, misappropriation of trade secrets, and injunctive relief.

## ARGUMENT

### I.

### THIS ACTION SHOULD BE TRANSFERRED TO THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK.

### A.    The Applicable Legal Standard

This action should be transferred to the Western District of New York ("WDNY") pursuant to 28 U.S.C. § 1404(a), which provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Courts in the District of Massachusetts weigh the following factors to determine whether to transfer a case to an alternative forum pursuant to section 1404(a):

1.    The convenience of the parties;

2.    The convenience of the witnesses;

3.    The relative ease of access to sources of proof;

4.    The availability of process to compel attendance of unwilling witnesses;

5.    The cost of obtaining willing witnesses;

6.    Any practical problems associated with trying the case most expeditiously and inexpensively;

7.    The interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action;

8.    The avoidance of unnecessary problems in conflicts of laws, or in the application of foreign law;

9.    The local interest in having localized controversies decided at home;

10.   The unfairness of burdening citizens in an unrelated forum with jury duty; and

11.   Administrative difficulties flowing from court congestion.

Atari v. United Parcel Service, Inc., 211 F. Supp. 2d 360, 362 (D. Mass. 2002).

## B.    The Relevant Facts Require the Transfer of this Action

All of the relevant facts weigh heavily in favor of transferring this action to the WDNY, and there is no conceivable basis to keep this action in this district. As a preliminary matter, there is no question that this action "might have been brought" in the WDNY, because Kodak is headquartered within that district. (Pinkham Aff. ¶ 1). Thus that transfer requirement is met.

It is also beyond dispute that "the convenience of parties and witnesses" and "the interest of justice" requires that this matter be transferred to the WDNY.

1.    The Convenience of Key Witnesses, and the Availability of Process to Compel Attendance of Those Witnesses, if Necessary, Favors Transfer to the WDNY

The convenience of the expected witnesses is "probably the most important factor, and the factor most frequently mentioned." Atari, 211 F. Supp. 2d at 362; Princess House, Inc. v. Lindsey, 136 F.R.D. 16, 18 (D. Mass. 1991); Brant Point Corp. v. Poetzsch, 671 F. Supp. 2, 3 (D. Mass. 1987). "The court must consider the number of potential witnesses located in both the transferor and the transferee district, the nature and quality of their testimony, and whether the witnesses can be compelled to testify." Atari, 211 F. Supp. 2d at 362; Princess House, 136 F.R.D. at 18. "It is well settled that the trier of fact should not be forced to rely on deposition

evidence when the deponent's live testimony can be procured through transfer. This is especially so when the 'qualitative value' of the witnesses' testimony is high." Brant Point, 671 F. Supp. at 4-5 (internal citations omitted).

Here, there are no witnesses who reside in the District of Massachusetts. Virtually all of the Kodak employees who were involved with TouchPoint reside in Rochester, New York. (Pinkham Aff. ¶ 7). The WDNY is far more convenient for those witnesses than the District of Massachusetts. The key Kodak decision maker, Kent McNeley, is no longer a Kodak employee, but still resides within the WDNY. (Pinkham Aff. ¶ 6). His live testimony could not be compelled by this Court, but could be compelled within the WDNY.

It appears that virtually all of the TouchPoint employees involved in this matter work in TouchPoint's Toronto headquarters, and presumably reside in and around Toronto. (Pinkham Aff. ¶ 11). While they are outside of the subpoena range of any United States Court, proceeding in the WDNY as opposed to Boston would be far more convenient for them, as well for the Kodak employees. Toronto is virtually in Rochester's backyard (or Rochester is in Toronto's backyard), being separated by a mere 70 miles regularly covered by ferry service. (See http://www.rochester-ferry.com). On the other hand, 550 miles separate Toronto and Boston. (See http://www.mapquest.com).

### 2.    The Convenience of the Parties Favors the WDNY

It is beyond dispute that it would be far more convenient to Kodak to litigate this dispute in the WDNY. Kodak's corporate headquarters, its general counsel's office, and its own employee witnesses (with few exceptions) are located in the WDNY. (Pinkham Aff. ¶¶ 1, 10). Accordingly, much of the relevant evidence is already in the WDNY.

Kodak knows of no TouchPoint presence within Massachusetts. Toronto, the home of TouchPoint's corporate headquarters and of the TouchPoint employees involved in this dispute, is much closer to the WDNY than to Massachusetts.

In sum, the actual "convenience of the parties" (as well as the convenience of virtually all of the witnesses) weighs heavily in favor of transferring this matter to the WDNY.

### 3.    The Application of New York Law Favors Transfer

New York law should govern the claims in this case. None of the activities at issue here occurred in Massachusetts. (Pinkham Aff. ¶ 12). Thus, at a minimum, there is no basis for applying Massachusetts law. The Kodak activities that occurred in connection with this project – including most if not all of the purported representations made by Kodak to Touchpoint (if any), Kodak's treatment of TouchPoint information (that TouchPoint alleges Kodak misappropriated), and the Kodak decision not to proceed with TouchPoint on the final terms and conditions offered by TouchPoint – generally occurred in Rochester, New York. (See Pinkham Aff. ¶¶ 5-10). TouchPoint's claims based on Kodak conduct should therefore be governed by New York law. See, e.g., Tidemark Bank for Savings, F.S.B. v. Morris, No. 94-1598, 1995 U.S. App. LEXIS 15170 (1st Cir. 1995). Moreover, the CDA contains a New York choice of law provision. Two of the claims at issue here are based on that agreement and are subject to New York law because of the choice of law provision in that agreement. Fleet Nat'l Bank v. Gray., No. 03-1613, 2004 U.S. App. LEXIS 14253, at *25-26 (1st Cir. July 12, 2004). The CDA's choice of New York law provides further support for applying New York law to the related tort claims. Words, Inc. v. Xerox Corp., No. 99-1182, 2000 U.S. App. LEXIS 3173, at *6 (4th Cir. Mar. 2, 2000). In sum, New York law should apply to all of TouchPoint's claims.

There is a strong interest in having diversity disputes, such as this one, tried in a forum that is at home with the law that governs the dispute.  Thus the fact that New York law, not Massachusetts, will apply here strongly favors transfer to the WDNY.  <u>Princess House</u>, 136 F.R.D. at 22.

> **4.** Massachusetts Citizens Have No Interest in Serving as Jurors for this Out-of-State Dispute

It would be unfair to burden the good citizens of Massachusetts with jury duty in this matter.  There is absolutely no connection between the Commonwealth and the dispute.  There is, however, a legitimate "localized interest" in the WDNY to have this dispute tried there.

Simply put, the "operative facts" at issue here have no connection with the District of Massachusetts, but have a strong connection with the WDNY.  While plaintiff's choice of forum is entitled to some deference, "where the operative facts of the case have no material connection with this district, plaintiff's choice of forum carries less weight."  <u>Liberty Mutual Ins. Co. v. Gardere & Wynne, L.L.P.</u>, No. 94-10609-MLW, 1994 U.S. Dist. LEXIS 17928, at *31-32 (D. Mass. Dec. 6, 1994) (allowing defendants' motion to transfer venue where plaintiff's choice of forum was only factor weighing against transfer); <u>Brant Point</u>, 671 F. Supp. at 5 (same).

At the end of the day, only plaintiff's counsel has an interest in trying this case in the District of Massachusetts, where counsel's offices are located.  That interest falls far short of providing a colorable basis for holding this matter in this Court.

- 10 -

## II

## IN THE ALTERNATIVE, COUNTS I, III, AND IV SHOULD BE DISMISSED

### A.    TouchPoint's Breach Of The CDA Claim Should Be Dismissed For Failure To State A Claim On Which Relief Can Be Granted (Count I)

TouchPoint's breach of the CDA claim is fatally flawed because the complaint fails to allege that TouchPoint met its obligations under the CDA and satisfied the CDA's condition precedent. Accordingly , the claim should be dismissed pursuant to Rule 9(c) and 12(b)(6).

Rule 9(c) "obliges the pleader to allege compliance with the contract or the performance of any relevant conditions . . . ." 5A CHARLES ALAN WRIGHT& ARTHUR P. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1303, at 326 (3d ed. 2004). Where, as here, Rule 9(c) has not been satisfied, the claim should be dismissed pursuant to 12(b)(6). D'Accord Financial Services, Inc. v. Metsa-Serla Oy, No. 98 CIV. 5847, 1999 U.S. Dist. LEXIS 1202, at *5-6 (S.D.N.Y. Feb. 8, 1999); see generally Walton v. Nalco Chem. Co., 272 F.3d 13 (1st Cir. 2001).

The CDA set forth the parties' agreement regarding how they would treat "confidential information". It contained a clear and unambiguous condition precedent that required TouchPoint to designate – in writing – information as "confidential" for that information to be protected by the CDA. (CDA ¶ 7). Any information TouchPoint provided Kodak without such designation was not entitled to any confidentiality protection by Kodak.

For reasons that would become apparent during discovery (TouchPoint largely failed to designate information as confidential pursuant to the CDA), TouchPoint would prefer to ignore the CDA's condition precedent. But precisely because the CDA's condition precedent is such a critical issue here, and TouchPoint's failure to satisfy it would ultimately doom its claims under the CDA, TouchPoint should not be allowed to ignore this condition precedent. Accordingly,

TouchPoint's breach of the CDA should be dismissed pursuant to Rule 9(c) and 12(b)(6) for failure to plead satisfaction of the CDA's condition precedent, which is an essential element of this breach of contract claim. See D'Accord Financial, 1999 U.S. Dist. LEXIS 1202, at *6.

**B.    The Implied Covenant of Good Faith and Fair Dealing Claim Does Not State a Claim (Count III)**

TouchPoint's breach of the implied covenant of good faith and fair dealing claim should be dismissed pursuant to Rule 12(b)(6). Such claims require an underlying contract. See, e.g. Wood v. Lucy, Lady Duff Gordon, 222 N.Y. 88 (1917); Dalton v. Educational Testing Service, 87 N.Y.2d 384 (1995); Restatement (Second) of Contracts, § 205. TouchPoint, however, fails to plead that its implied covenant claim is based on any Kodak-TouchPoint contract. While the complaint identifies three Kodak-TouchPoint contracts (Complaint ¶¶ 7, 8 and 13), it nowhere indicates if any of those contracts is the basis of this implied covenant of good faith claim.

The complaint does not appear to base the implied covenant claim on either the Non-Circumvention Agreement or PSA. If TouchPoint's implied covenant claim rests on the CDA, it is fatally flawed. It is black letter law that the implied covenant of good faith cannot be invoked to alter any of the agreed upon terms of an agreement. CIBC Bank and Trust Co. (Cayman) Ltd. v. Banco Cent. do Brasil, 886 F. Supp. 1105, 1116 (S.D.N.Y. 1995); Murphy v. Am. Home Prods Corp., 58 N.Y.2d 293, 304; Dalton, 87 N.Y.2d at 390. Here, as shown above, the CDA required TouchPoint to designate in writing any information Kodak was to treat as confidential. If TouchPoint properly designated certain information as confidential under the CDA, then it presumably is entitled to the protection of that agreement. TouchPoint's breach of the CDA claim (Count I) should provide TouchPoint with all of the relief it would be entitled to if Kodak failed to treat as confidential "confidential information" properly designated as such by TouchPoint. If, however, TouchPoint failed to follow the CDA's clear and unambiguous

provisions for invoking its protections, then TouchPoint is not entitled to rely on this implied covenant as a basis for protecting information TouchPoint failed to designate as confidential. To allow such a result would be to allow the covenant of good faith to alter the fundamental terms of the CDA.

Indeed, to permit such a result would destroy the fundamental purpose of the CDA. The CDA's designation requirement provides TouchPoint – and Kodak – clarity and certainty as to how each party was to treat the other's information. The CDA required information designated – in writing – as "confidential," to be treated as such. If information was provided without such a designation, the receiving party did not have to make an independent assessment of whether that information somehow warranted confidential treatment. Instead, the receiving party was entitled to rely on the express terms of the CDA and the absence of any "confidential" designation. The implied covenant of good faith should not be used to undermine such a legitimate, commercially reasonable and self-evident bargain between two sophisticated business entities.

A similar implied covenant claim was properly rejected in a dispute involving another plaintiff's attempt to rely on the covenant to excuse it's failure to invoke the protections of a confidentiality agreement :

> [Plaintiff's] argument that the implied covenant of good faith and fair dealing saves its contract claim is likewise without merit. While every contract includes a covenant of good faith, ... [h]ere the parties signed an agreement that provided for confidentiality of certain information that was designated in writing. [Plaintiff] is not denied the benefit of its bargain by enforcement of this contract term. Had it wished to enter a contract which required only oral designation of confidentiality it could have done so, but it did not. I decline to use the covenant of good faith and fair dealing to add a new term to the contract agreed upon between [plaintiff and defendant]....

<u>Robotic Vision Sys. v. General Scanning, Inc.</u>, No. 96-CV-3884, 1997 U.S. Dist. LEXIS 23226, *18-19 (E.D.N.Y. Sept. 8, 1997).

### C.    The Fraud Claim Should Be Dismissed For Failure to Satisfy Rule 9(b)'s Particularity Requirements (Count IV)

The TouchPoint complaint uses strong language to accuse Kodak of defrauding TouchPoint:

> [Kodak] executed on this plan of deceit and theft of trade secrets through a series of misrepresentations to Plaintiff to induce it to disclose the confidential information and forebear from its own competitive efforts

> \*       \*       \*

> Kodak's lies are evident from its disclosure of the technology, use of the technology in Kodak's own products, theft of TouchPoint's customers, misrepresentation of the reasons for the abrupt cancellation and blatant misuse of TouchPoint's trade secrets.

> \*       \*       \*

> Kodak has made material misrepresentations to TouchPoint, as set forth above, intending that TouchPoint rely on these misrepresentations.

(Complaint ¶¶ 1, 20, 32).

The subject matter of Kodak's alleged misrepresentations is set forth in conclusory fashion in paragraph 20 of the complaint, which refers to, among other things, alleged misrepresentations regarding Kodak's "exclusive commitment", "promises of confidentiality", "the reasons for [Kodak's] investigation and study of TouchPoint's product," and "Kodak's commitment to the joint venture."

Based on these allegations, the complaint asserts a claim for fraud, which it somewhat disingenuously designates as a claim for "misrepresentation." The complaint fails, however, to provide any of the particularity required by Rule 9(b):

- 14 -

> In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed. R. Civ. P. 9(b).

The Court of Appeals for the First Circuit has repeatedly held that Rule 9(b) requires that a plaintiff asserting a fraud claim must allege the "time, place and content of the alleged misrepresentations with specificity ...". Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999). Accord Giuliano v. Nations Title, Inc., No. 96-2331, 1998 U.S. App. LEXIS 1136, at *21 (1st Cir. Jan. 23, 1998); Doyle v. Hasbro, Inc., 103 F.3d 186 (1st Cir. 1996). Failure to plead fraud with the particularity required by Rule 9(b) warrants dismissal of the claim pursuant to Rule 12(b)(6). Alternative Sys. Concepts, Inc. v. Synopsys, Inc., No. 03-1406, 2004 U.S. App. LEXIS 13880, at *12-15 (1st Cir. July 7, 2004).

The TouchPoint complaint does not even attempt to satisfy Rule 9(b)'s particularity requirement. The complaint does not identify a single alleged misrepresentation with specificity: no speakers are identified, the time and place of the alleged misrepresentations is not specified, and the actual content of the alleged misrepresentations is not specified.

Rule 9 pleading requirements are not mere technicalities to be disregarded whenever they are found to be inconvenient. Rule 9(b) imposes a heightened pleading requirement for fraud in order "to protect defendants whose reputation may be harmed by frivolous claims of fraud ...". Doyle, 103 F.3d at 194. See generally 5A CHARLES ALAN WRIGHT & ARTHUR P. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1296 (3d ed. 2004) ("Rule 9(b) is necessary to safeguard defendants from lightly made claims... that involve some degree of moral turpitude..."); McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226, 229 n.2 (1st Cir. 1980). Rule 9(b) applies with particular force here, precisely because the TouchPoint complaint attacks Kodak's reputation. Rule 9(b) is intended to prevent litigants, such as TouchPoint, from transforming

business disappointment and frustration into unwarranted and unsupportable – but publicly disseminated – allegations of immoral conduct. Rule 9(b) protects defendants such as Kodak by requiring such charges to be predicated on specific statements, and Rule 9(b) achieves its salutary purpose by requiring claims of the sort TouchPoint advances here to specify the time, place, and contents of the allegedly misleading statements. TouchPoint should be held to these simple requirements of specificity: its fraud claim should be dismissed because the complaint fails to satisfy Rule 9(b)'s specificity requirements.

### CONCLUSION

For the reasons set forth above, this action should be transferred to the Western District of New York pursuant to 28 U.S.C. 1404(a). Alternatively, the Court should dismiss Counts I, III and IV.

EASTMAN KODAK COMPANY,
By its attorneys,

Nicholas G. Papastavros (BBO # 635742)          Robert Calihan
NIXON PEABODY LLP                                NIXON PEABODY LLP
100 Summer Street                                Clinton Square
Boston, MA  02110                                Rochester, NY  14603
(617) 345-1000                                   (585) 263-1000

DATED:  August 13, 2004

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on 8/13/04

2004 AUG 13 P 6: 03

R788827.1