# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

TOUCHPOINT SOLUTIONS, INC.,
Plaintiff,

v.

EASTMAN KODAK COMPANY,
Defendant.

Civil Action No. 04-11014-NMG

## PLAINTIFF TOUCHPOINT SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

In a blatant attempt to distract this Court from the fundamental issues of misappropriation of trade secrets, breach of confidentiality and the resulting irreparable harm, Defendant Eastman Kodak Company ("Kodak") asks the Court to dismiss on procedural grounds three out of the five claims raised in Plaintiff TouchPoint Solutions, Inc.'s ("TouchPoint") Complaint. Not only are all of TouchPoint's claims adequately plead in the Complaint, TouchPoint has further substantiated these claims as a result of the expedited discovery process.

A. **Kodak's Motion To Dismiss Rests On An Overly Narrow View Of The Contractual Duties Issue**

Kodak asks the Court to dismiss TouchPoint's breach of contract claim based on TouchPoint's alleged failure to satisfy a condition precedent in the Confidential Disclosure Agreement ("CDA"). *See Defendant's Motion to Dismiss, p. 10.* Not only does this claim fail as a matter of fact, but it also relies on a dubious contractual interpretation that would be more appropriately analyzed by the Court on a full record after viewing the relevant discovery.

Kodak alleges that TouchPoint failed to designate certain materials it provided to Kodak "confidential" and, resulting, has no legal grounds for its breach of contract claim. As the Complaint reflects, TouchPoint and Kodak entered into a business relationship and signed the CDA on April 9, 2003. *See Complaint, ¶ 7.* Soon thereafter, after confirming their

confidentiality agreement, both parties began exchanging proprietary documents without stamping or otherwise designating the materials "confidential." Kodak argues that TouchPoint has failed to designate *some* of the material that it turned over to Kodak as "confidential" in accordance with a single clause of the CDA, that TouchPoint somehow waived *all* of their rights allowing Kodak somehow to use all of TouchPoint's information – whether marked confidential or not – in any way it deemed fit. Such an argument lacks any legal basis and defies common sense. Further, the logical corollary of Kodak's overly narrow reading of the CDA leaves unprotected any and all of Kodak's proprietary information, which it turned over to TouchPoint without a designation of confidentiality. Neither party intended this result when entering into the CDA.

First, this argument should be rejected because it is very much a factual issue. To the extent this Court deems it necessary to include the formulaic pleading that TouchPoint did not comply with the conditions precedent, it will do so. However, such an argument plainly raises form over substance. Second, Kodak also conveniently ignores the other contractual duties between the parties – both express and implied – which sprung from the CDA and which were breached by Kodak. *See Burten v. Milton Bradley Co.*, 763 F.2d 461, 462-63 (1st Cir. 1985) (stating that "[t]he essence of a wrong [in a misappropriation claim] is generally the breach of the duty not to disclose or to use without permission confidential information acquired from another") (internal quotations omitted). The CDA specifically defines TouchPoint's "Confidential Information" as its "Catapult Enterprise software platform for distributed, managed network, [to] securely deploy[,] manage, monitor, and monetize application content on remote devices." *See Confidential Disclosure Agreement*, attached hereto as Exhibit A, ¶ 5. The CDA further prohibits either party from "analyz[ing] the composition of, or reverse engineer[ing], or decompil[ing] any tangible materials or components of software constituting confidential information provided by Discloser hereunder." *See id.*, at ¶ 10.

The weight of TouchPoint's breach of contract claim, which has been reinforced by expedited discovery, is that Kodak was under multiple duties – both express and implied – to keep the information received from TouchPoint confidential. Not only is TouchPoint's breach of contract claim based in large part on the terms of the CDA as outlined above, but it is also based on the other contractual duties that come part in parcel with the use of TouchPoint's software, for example, Kodak's assent to an End User License Agreement built into TouchPoint's software and their repeated access to a password protected server provided by TouchPoint with confidentiality restrictions.

In sum, TouchPoint's Complaint adequately pleads its breach of contract claims. Given the complexity of the contractual relations between the parties, this issue is inappropriate to decide through a motion to dismiss and would be more adequately analyzed by the parties' soon-to-be-filed preliminary injunction papers. Finally, if the Court deems necessary and proper, TouchPoint is willing to supplement its Complaint in light of the expedited discovery taken to date.

**B. TouchPoint's Implied Covenant Of Good Faith And Fair Dealing Claim Is Clearly Based On The Contractual Duties Outlined Above**

Kodak's asserts that TouchPoint's breach of the implied covenant of good faith and fair dealing claim should be dismissed because it is not based on any underlying contract. Again, Kodak takes a self-servingly narrow view of the Complaint and the facts at issue in this case. The implied covenant of good faith and fair dealing exists for the general purpose of ensuring that parties act in good faith in their contractual dealings with each other and do "not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." *Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 230 (2d Cir. 1991). Here, Kodak seeks to turn the covenant of good faith and fair dealing on its head and twist the language of a single clause of the CDA to suit its purposes while simultaneously

ignoring the conduct of its own officers and employees.

As discussed in Section A above, the parties entered into multiple express (written and oral) and implied contracts throughout their professional relationship and business negotiations. Each of these express contracts – including, but not limited to, the CDA, the End User License Agreement for TouchPoint's Catapult Software, the Non-Circumvention Agreement entered into on July 7, 2003, the Professional Services Agreement entered into on March 21, 2004 and the numerous oral agreements of confidentiality during this period – implicate the covenant of good faith and fair dealing and serve as adequate basis for TouchPoint's Complaint. *See Complaint*, ¶¶ 7, 8, 13; *see also Times Mirror Magazines, Inc. v. Field & Stream Licenses, Co.*, 294 F.3d 383, 394 (2d Cir. 2002) (holding that a duty of good faith and fair dealing is implicit in every contract, and although no obligation can be implied that would be inconsistent with the other terms of the contract, the duty "includes any promises which a reasonable person in the position of the promisee would be justified in understanding were included"). Kodak's view, however, is that the only contract that matters is the CDA and because it contends that TouchPoint did not adhere to a single clause of the CDA, it should somehow be barred from pursuing its claims against Kodak.

Again, such a position lacks legal foundation . Even the case upon which Kodak hinges all of its hopes for this litigation – the unpublished decision in *Robotic Vision Sys., Inc. v. Gen. Scanning, Inc.*, No. 96-CV-3884, 1997 WL 1068696, at *7 (E.D.N.Y. Sept. 8, 1997) – is easily distinguishable. Unlike the plaintiff in *Robotics* who was ultimately barred from bringing a breach of contract claim after disclosing and not marking confidential during a *single* lunch meeting, here, the parties discussions grew to a multi-phase year long relationship during which time the parties' technical teams had countless discussions about highly proprietary aspects of their software products; which were the subject of the EULA and the password protected

4

server.[1]    This is not a case of a single disclosure; rather, the parties here expressly agreed that the confidentiality of shared information. The covenant of good faith and fair dealing arises throughout those agreements – written and oral.

Again, given the complexity of the parties' relationship and the obvious connection to the contractual issues raised in Section A, the Court should deny Kodak's 12(b)(6) Motion and review these substantive issues on a full record.

## C. The Allegations In The Complaint Fall Well Within The Requirements Of Rule 9(b) And Have Been Substantiated Through Expedited Discovery.

Finally, Kodak's claims that TouchPoint fails to state with particularity its averments of fraud in compliance with Federal Rule of Civil Procedure 9(b). Kodak alleges that TouchPoint's Complaint does not adequately identify the fraudulent conduct at issue, does not identify the instance of fraud with specificity, and does not outline the actual content of the misappropriation. Again, Kodak's Argument fails on both legal and factual grounds.

The Complaint is adequately plead as it stands. Despite Kodak's protests to the contrary, the Complaint provides adequate particularity given the complexity of the parties' year long relationship and the countless communications at issue. In ¶ 17 of its Complaint, TouchPoint alleges the crux of its fraud claim. Despite its repeated promises to the contrary:

> In **April of 2004**, TouchPoint learned that Kodak had provided substantial amounts of TouchPoint's highly confidential information to **direct competitors**, including **technical, pricing and business related confidential information**. Kodak's **in-house development** and **commercialization teams** had been working with **both TouchPoint and its competitors**, and sharing TouchPoint's highly confidential information and trade secrets during this process.

Although the Complaint does not name specific individuals in defining the fraud (because,

---

[1]    It should be noted that *Robotics* is something of an aberration even in New York, where it has been cited only once in the seven years since it was written (but not reported), and even the one case that relied on *Robotics* – *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F.Supp.2d 492, 501 (S.D.N.Y. Oct 29, 2002) - did so for entirely different purposes than those upon which Kodak currently relies upon the case.

before expedited discovery, TouchPoint did not have this precise information), the Complaint provides the approximate date the conduct occurred, the type of information that was betrayed, and narrowed down the number of people at Kodak who perpetrated the fraud to either the in-house development team and/or the commercialization teams with which TouchPoint had worked between late 2003-2004.

As the Courts have stated, "in analyzing the sufficiency of a pleading under Rule 9(b), a district court must balance the rule with both Fed. R. Civ. P. 8(a), which requires only a 'short and plain statement' of the claims for relief, and Fed. R. Civ. P. 8(f), which provides that 'all pleadings shall be construed as to do substantial justice'...a plaintiff need not plead dates, times and places with absolute precision, so long as the complaint 'gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based.'" *Berk v. Tradewell, Inc.*, No. 01 Civ. 9035, 2003 WL 21664679, at *12 (S.D.N.Y. July 16, 2003) (attached hereto as Exhibit B) *quoting Int'l Motor Sports Group, Inc. v. Gordon*, No. 82709, No. 98 Civ. 5611, 1999 WL 619633, at *3 (S.D.N.Y. Aug. 16, 1999); *see also ABF Capital Mgmt. V. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1327 (S.D.N.Y. 1997) (holding that "[i]t is particularly appropriate to ease the pleading burden under Rule 9(b) when information is within the exclusive control of the defendant"); *U.S. ex rel. Franklin v. Parke-Davis*, 147 F.Supp.2d 39, 49 (D. Mass. 2001) (holding that where "the alleged scheme of fraud is complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible"). Here, at the time of the filing of the Complaint, Kodak — not TouchPoint — knew all of the particularities about its conduct both internally and with TouchPoint's third-party competitors. TouchPoint pled its fraud claims with all the particularity intended by Rule 9(b) in such a complex case.

Now, after a brief period of expedited discovery, even more facts have come to light to substantiate TouchPoint's fraud claim. Not only is this issue not appropriate for dismissal, but if necessary, TouchPoint will supplement its Complaint to provide further evidence of Kodak's

fraud. *See U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 228-229 (1st Cir. 2004) (holding that Rule 9(b) may be relaxed to provide an opportunity for the plaintiff to plead generally at the outset and then later amend the complaint by "filling in the blanks through discovery"). Those details can easily be provided in any subsequent discovery.

TouchPoint respectfully requests that this Court deny Kodak's Motion to Dismiss.

Respectfully submitted,

TOUCHPOINT SOLUTIONS, INC.,

By its attorneys,

H. Joseph Hameline, BBO #218710
Geri L. Haight, BBO #638185
Mintz, Levin, Cohn, Ferris,
  Glovsky & Popeo, P.C.
One Financial Center
Boston, MA 02111
617-542-6000

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of September, 2004, I caused the foregoing *Plaintiff Touchpoint Solutions, Inc. 's Opposition To Defendant's Motion To Dismiss* to be served by fax and first-class mail on the following:

Nicholas G. Papastavros, Esquire
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110

Robert Calihan
Nixon Peabody, LLP
Clinton Square
Rochester, NY 14603

Geri L. Haight

A

# CONFIDENTIAL DISCLOSURE AGREEMENT
(Corporate Commercial Affairs CDA Form I.1)

EXHIBIT A

In order to protect certain confidential information, Eastman Kodak Company ("EKC"), on behalf of itself and its subsidiaries, (collectively "Kodak") and the "Participant" identified below, agree that:

**1. Disclosure Period:** This agreement pertains only to confidential information disclosed between (M/D/Y) __04/09/03__ ("Effective Date") and 12 months thereafter.

**2. Disclosing Party:** The following party or parties ("Discloser") will be disclosing confidential information (check one or both):
- ✓ Kodak (if checked, complete paragraph 4 below)
- ✓ Participant (if checked, complete paragraph 5 below)

**3. Primary Disclosure Coordinator:** The representatives responsible for coordinating the disclosure and/or receipt of confidential information are:
Kodak  Stephen L. Pellow
Participant  SHAHARA JAFFER

**4. Kodak's Confidential Information** relates to (write a specific description if applicable):
Photography Group and System Concept Center business plans, concepts, products, and services

**5. Participant's Confidential Information** relates to (write a specific description if applicable):
"CATAPULT" Enterprise software platform for distributed managed network securely deploy, manage, monitor & monitize application content on remote devices

**6. Confidentiality Period:** A party receiving confidential information ("Recipient") shall not disclose such information for a period of 3 years (extended to ___ 4 or ___ 5 years if checked) from the Effective Date except to its or their employees and contractors who have a need to know and who are bound to keep such information confidential.

**7. Identifying Confidential Information:** This agreement pertains only to information which is: (a) disclosed in tangible form and clearly labeled as confidential at the time of disclosure, or (b) disclosed initially in non-tangible form and identified as confidential at the time of disclosure and, within thirty days following the initial disclosure, is summarized and designated as confidential in a written memorandum delivered to the Recipient.

**8. Degree of Care:** Recipient shall protect the confidential information against unauthorized disclosure using the same degree of care, but no less than a reasonable degree of care, as the Recipient uses to protect its own confidential information of a like nature.

**9. Information not Covered:** This Agreement imposes no obligation upon Recipient with respect to information that: (a) does not fall within the scope of confidential information described in paragraph 4 or 5; (b) was in Recipient's possession in tangible form before receipt from Discloser; (c) is or becomes a matter of public knowledge through no fault of the Recipient; (d) is rightfully received by the Recipient from a third party without a duty of confidentiality; (e) is disclosed by the Discloser to a third party without a duty of confidentiality on the third party; (f) is independently developed by the Recipient; (g) is disclosed under operation of law after prior notice to Discloser; or (h) is disclosed by Recipient with the Discloser's prior written approval.

**10. Samples:** During the period of obligation under paragraph 6, a Recipient shall not analyze the composition of, or reverse engineer or decompile any tangible materials or components or software constituting confidential information provided by Discloser hereunder.

## General Terms

**11.** Except as expressly provided herein, neither party (a) acquires any intellectual property rights under this Agreement; (b) assumes any obligation of any kind; (c) has any obligation under this Agreement to disclose any information or to deal exclusively with the other party in any field; (d) has any obligation to purchase, sell, license, or otherwise transfer any technology, services, or products.

**12.** Any information disclosed hereunder is provided "AS IS" and without any warranty, except Discloser warrants it has the right to make such disclosures.

**13.** A Recipient shall adhere to the U.S. Export Control Laws and Regulations and shall not export or re-export any technical data or products received from the Discloser or the direct products of such technical data to any proscribed country listed in the U.S. Export Administration Regulations unless properly authorized by the U.S. Government.

**14.** This Agreement does not create any agency or partnership relationship between the parties.

**15.** EKC will cause its subsidiaries that receive confidential information hereunder to comply as a party with the terms of this Agreement.

**16.** All modifications to this Agreement must be made in writing and must be signed by both parties.

**17.** This Agreement is made under and shall be construed according to the laws, other than choice of law provisions, of the State of New York.

343 State Street
Rochester, New York 14650

AUTHORIZED SIGNATURE:
By _____
PRINTED SIGNATORY'S NAME/BUSINESS UNIT:
Kent D. McNeley / Consumer Imaging Output Products Equip. & Serv.
PRINTED SIGNATORY TITLE:
General Manager and Vice President

COMPANY NAME:
TouchPoint Solutions, Inc.
COMPANY ADDRESS:
5180 Orbitor Drive, Toronto, ON L4W 5L9
AUTHORIZED SIGNATURE:
By _____
PRINTED SIGNATORY'S NAME:
Anila Jobanputra
PRINTED SIGNATORY TITLE:
President

Corporate Commercial Affairs   Corporate Commercial Affairs   Corporate Commercial Affairs

**NOTE TO KODAK DISCLOSURE COORDINATOR:**
Make two copies of this Agreement, and have each signed by both parties.
Send a copy with original signatures to Corporate Commercial Affairs (Participant retains the other).
Make two copies of the signed Agreement ~ Send one to your Unit Manager, and retain one for your records.

**B**

**Westlaw.**

Not Reported in F.Supp.2d
2003 WL 21664679 (S.D.N.Y.), RICO Bus.Disp.Guide 10,510
**(Cite as: 2003 WL 21664679 (S.D.N.Y.))**

Page 1

**C**

Motions, Pleadings and Filings

United States District Court,
S.D. New York.

Jeffrey S. BERK, Plaintiff,
v.
TRADEWELL, INC., William Steinberg, Marlene
Steinberg, and Midge Tyner,
Defendants.
Timothy C. BULLARD, Plaintiff,
v.
TRADEWELL, INC., William Steinberg, Marlene
Steinberg, and Midge Tyner,
Defendants.

**No. 01 Civ. 9035(MBM), 01 Civ. 10068(MBM).**

July 16, 2003.

Jeremy E. Deutsch, Deutsch Coffey and Metz, New
York, NY, for Plaintiffs.

Steven L. Mandelsberg, Mark T. Power, Andrew K.
Lipetz, Hahn & Hessen LLP, New York, NY, for
Defendant Tradewell, Inc.

Eric A. Rosen, Abrams Garfinkel & Rosen, New
York New York, for Defendants William Steinberg
and Marlene Steinberg.

Joseph O. Giaimo, Giaimo & Vreeburg, Kew
Gardens, New York, for Defendant Midge Tyner.

OPINION AND ORDER

MUKASEY, J.

*1 Plaintiffs Jeffrey S. Berk and Timothy C. Bullard
sue their former employers, Tradewell, Inc.
("Tradewell"), William Steinberg, Marlene Steinberg,
and Midge Tyner, alleging violation of the Racketeer
Influenced and Corrupt Organizations Act ("RICO"),
18 U.S.C. § § 1961 et seq. (2000), violation of the
Employee Retirement Insurance Security Act
("ERISA"), 29 U.S.C. § § 1001 et seq. (2000),
breach of fiduciary duty, and breach of and
intentional interference with contract. The plaintiffs
also seek declaratory judgments and make claims in

quantum meruit. Defendants Tradewell and Tyner
move to dismiss various claims under Rules 8, 9,
12(b)(1), and 12(b)(6). For the reasons set forth
below, their motions are granted in part and denied in
part.

I.

The relevant facts alleged in the complaints, which
are accepted as true for purposes of this motion, are
as follows:

Tradewell is a corporation that specializes in
corporate barter. In a typical transaction, Tradewell
would purchase excess inventory, discontinued
product lines, and the like from companies in
exchange for "trade credits." These trade credits
could be redeemed for goods and services at below-
market rates from other businesses with which
Tradewell contracted. In some cases, a client would
also require Tradewell to pay a portion of the sales
price of the goods back to the client. (Berk Second
Am. Compl. ¶ 4; Bullard First Am. Compl. ¶ 4)
William Steinberg is the co-founder of Tradewell, an
officer of the company, and a 50% shareholder. (Berk
Second Am. Compl. ¶ 6; Bullard First Am. Compl. ¶
6) Marlene Steinberg is William Steinberg's wife and
also an officer of Tradewell. (Berk Second Am.
Compl. ¶ 7; Bullard First Am. Compl. ¶ 7) Tyner is
the other founder of Tradewell, an officer, and a 50%
shareholder. (Berk Second Am. Compl. ¶ 9; Bullard
First Am. Compl. ¶ 9) In May or June 2001, Tyner
sold an option to William Steinberg to purchase her
shares in the company, but the plaintiffs do not
believe that option has yet been exercised. (Berk
Second Am. Compl. ¶ 9; Bullard First Am. Compl. ¶
9) Tyner and the Steinbergs jointly managed and
controlled Tradewell and continue to do so. (Berk
Second Am. Compl. ¶ 10; Bullard First Am. Compl.
¶ 10)

On or about March 25, 1998, Bullard entered into a
contract with Tradewell for Bullard to serve as the
company's vice president of client services. (Bullard
First Am. Compl. ¶ 1) On February 1, 2000, Bullard
contracted to serve as senior vice president of client
services. (Id. Ex. A ("Bullard Contract") ¶ 1(b))
According to the contract, Bullard's principal
responsibilities as vice president of client services
included "identifying, generating and closing new
business opportunities." (Bullard Contract ¶ 1(c)) He
was paid a base salary of $600,000 per year. (Id. ¶

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1(d)) In addition, he was to receive a commission equal to ten percent of the "net cash" generated from merchandise sales with regard to Buena Vista Home Entertainment and other "key accounts" that were so approved by management, that he closed individually, and that he serviced as account executive during the term of the agreement. (*Id.* ¶ 1(e)(ii)) He was to be paid further commissions on cash generated from vendor trading transactions at a rate of fifteen percent for Buena Vista and five percent for other companies. (*Id.* ¶ 1(e)(iii)) Finally, Bullard was to receive a payment equal to five percent of the "net cash" in excess of $12 million generated from Tradewell's merchandise each fiscal year. [FN1] (*Id.* ¶ 1(e)(iv)) Upon leaving Tradewell, Bullard was to be eligible to receive commissions "only up to 30 days following departure." (*Id.* ¶ 1(e)(v)) Tradewell could terminate Bullard's employment for cause. (*Id.* ¶ 1(g)) Bullard agreed to covenants of nondisclosure, against solicitation of employees and actual or potential customers, against employment by a major competitor, and for exclusive use of business ideas. (*Id.* ¶ 4-7) The contract stated that it set forth "the entire understanding between the parties" and could "not be amended or modified except in a written document signed by Employee and Employer." (*Id.* ¶ 15)

> FN1. If Tradewell failed to meet the $12 million threshold in any given year, Bullard would not receive his payment unless the net cash generated from that shortfall year, plus the next year, exceeded $24 million. (Bullard Contract ¶ 1(e)(iv))

 *2 On April 1, 2001, Berk entered into a contract with Tradewell for Berk to serve as the company's vice president for business development. (*Id.* Ex. A ("Berk Contract") ¶ 1(b)) According to his contract, Berk's principal responsibilities and duties included "identifying, generating and closing new business opportunities." (Berk Contract ¶ 1(c)) He was paid a base salary of $100,000 per year (*id.* ¶ 1(d)), plus commissions "generated from the transactions consummated and closed by [him]" (*id.* ¶ 1(e)(ii)) and other benefits (*id.* at 1(f)). Tradewell could fire Berk for cause. (*Id.* ¶ 1(g)) A rider to the contract stated that "[u]pon departure of employee, for any reason, the employee will be eligible to receive commissions on deals that close only up to 30 days following departure." (*Id.* Ex. A ("Interoffice Memo")) Berk agreed to covenants of nondisclosure, against solicitation of employees and customers,

against employment by a major competitor, and for exclusive use of business ideas. (*Id.* ¶¶ 4-7) The contract, by its own terms, "set[ ] forth the entire understanding between the parties" and could "not be amended or modified except in a written document signed by Employee and Employer." (*Id.* ¶ 15) Additionally, Berk claims that he "specifically was responsible for doing deals in the technology sector" and that Tradewell's senior vice president of sales asked him to work on a deal involving Microsoft. (*Id.* ¶ 99)

 Defendants established a 401(k) retirement plan for Tradewell employees, including the plaintiffs. (Berk Second Am. Compl. ¶ 44; Bullard First Am. Compl. ¶ 61) Tradewell deducted money from the plaintiffs' paychecks pursuant to this plan. (Berk Second Am. Compl. ¶ 46; Bullard First Am. Compl. ¶ 63) Defendants never provided a copy of the 401(k) plan to plaintiffs, even after plaintiffs requested copies. (Berk Second Am. Compl. ¶ 49; Bullard First Am. Compl. ¶ 66) Defendants did not transmit to the plan administrator approximately $4375 of Berk's 2001 compensation that should have been transmitted (Berk Second Am. Compl. ¶ 50) and about $4040 of Bullard's 2001 compensation (Bullard First Am. Compl. ¶ 67).

 Defendants also issued to plaintiffs W-2 forms that misstated plaintiffs' gross wages and the amounts withheld, and defendants withheld more money from plaintiffs than defendants actually paid to the Internal Revenue Service. (Berk Second Am. Compl. ¶¶ 55, 57; Bullard First Am. Compl. ¶¶ 72, 74)

 Starting no later than 1998, defendants William Steinberg, Marlene Steinberg, and Tyner (the "individual defendants") conspired to defraud plaintiffs through a pattern of racketeering activity by which they operated Tradewell. (Berk Second Am. Compl. ¶¶ 14, 15, 17; Bullard First Am. Compl. ¶¶ 14, 15, 17) Unbeknownst to plaintiffs, the individual defendants had "unwritten side agreements" with various Tradewell customers and similar agreements with various brokers, that allowed Tradewell to understate sale prices, overstate brokers' fees, and manipulate dates of payment in order to reduce commissions due to the sales staff, of which both plaintiffs were members. (Berk Second Am. Compl. ¶¶ 23, 88; Bullard First Am. Compl. ¶¶ 23, 101) The individual defendants also received kickbacks on the overstated brokers' fees. (Berk Second Am. Compl. ¶ 23; Bullard First Am. Compl. ¶ 23) The individual defendants took money out of Tradewell in the form of loans, with Tyner taking $7,026,393 in

Not Reported in F.Supp.2d
2003 WL 21664679 (S.D.N.Y.), RICO Bus.Disp.Guide 10,510
(Cite as: 2003 WL 21664679 (S.D.N.Y.))

such loans and William Steinberg $8,555,328. (Berk Second Am. Comp. ¶ 37, Bullard First Am. Compl. ¶ 54) Plaintiff Berk alleges also that William Steinberg caused Tradewell to breach its contract with him by depriving him of the right to handle a deal with Microsoft and thus earn a commission. (Berk Second Am. Compl. ¶ ¶ 97-107)

*3 Plaintiffs detail several different allegedly fraudulent transactions. (*Id.* ¶ ¶ 27-34; Bullard First Am. Compl. ¶ ¶ 27-37) One will suffice as an example here. On or about March 20, 2000, Tradewell and Ericsson, Inc. entered into a contract to exchange cellular phones for trade credits. Tradewell received $1,571,840 for the sale of the inventory but reported only $1,271,840 in revenue to plaintiffs and Ericsson. (Berk Second Am. Compl. ¶ 27; Bullard First Am. Compl. ¶ 27) Plaintiffs were to be paid commissions based on the revenue from the sale of the Ericsson inventory and were thus deprived of income. (Berk Second Am. Compl. ¶ 28; Bullard First Am. Compl. ¶ 28) Later, in or about May 2001, Ericsson attempted to use its trade credits to help fund a $4.8 million media campaign. Ericsson was to pay Tradewell $3.6 million, with the balance paid for with trade credits. (Berk Second Am. Compl. ¶ 29(a); Bullard First Am. Compl. ¶ 29(a)) On or about July 2001, Ericsson paid Tradewell the $3.6 million. (Berk Second Am. Compl. ¶ 29(b); Bullard First Am. Compl. ¶ 29(b)) Tradewell bought media for Ericsson that was inferior to that which Ericsson had ordered and did not pay completely even for that inferior media; the individual defendants kept any excess funds for themselves. (Berk Second Am. Compl. ¶ 29(c); Bullard First Am. Compl. ¶ 29(c)) Tradewell, at the direction of the individual defendants, transmitted by mail and wire false reports to Ericsson regarding the media purchased. (Berk Second Am. Compl. ¶ 29(c)-(d); Bullard First Am. Compl. ¶ 29(c)-(d)) Ericsson canceled the vendor trading with Tradewell and required Tradewell to return $2.5 million in inventory. (Berk Second Am. Compl. ¶ 29(e); Bullard First Am. Compl. ¶ 29(e))

The individual defendants "rigidly restricted" access to information within Tradewell in furtherance of their scheme. (Berk Second Am. Compl. ¶ 21; Bullard First Am. Compl. ¶ 21) False reports were prepared by or at the direction of William and Marlene Steinberg and were transmitted through the United States mail and by wire. (Berk Second Am. Compl. ¶ 24; Bullard First Am. Compl. ¶ 24) Plaintiffs contend that many details regarding these frauds are in the sole possession of defendants. (Berk Second Am. Compl. ¶ 35; Bullard First Am. Compl.

¶ 38)

Starting in March 2000, Bullard discovered discrepancies in Tradewell's records regarding revenue sharing with Buena Vista Home Entertainment and other clients. (*Id.* ¶ ¶ 39-40) On June 29, 2001, he confronted the Steinbergs and was told to leave work early. Thereafter, the individual defendants fired Bullard's personal assistant and changed the location of Bullard's office. All Bullard's Buena Vista files disappeared. (*Id.* ¶ 41) Bullard then obtained reports which showed that other clients were not being paid. (*Id.* ¶ 42) After Bullard once again confronted the Steinbergs, his office was once again moved and all copies of the reports he had obtained were destroyed. (*Id.* ¶ 43) By October 12, 2001, Bullard was cut off from all secretarial services and told not to communicate with salespeople, except through Marlene Steinberg. (*Id.* ¶ 45) Additionally, on October 12, 2001, Bullard's e-mail archives on his personal laptop computer were erased after he left the computer unattended at Tradewell's offices. (*Id.* ¶ 48) On or about November 5, 2001, Bullard resigned. (*Id.* ¶ 83)

*4 On September 4, 2001, Berk was barred from Tradewell's offices; his e-mail and voicemail passwords were altered; he was denied access to his computer; and he was forbidden from communicating with Tradewell employees. (Berk Second Am. Compl. ¶ 36) On September 9, 2001, Marlene Steinberg notified Berk that he had been fired. (*Id.* ¶ 64)

On December 28, 2001, Tradewell filed for bankruptcy, listing over $15 million in bad debt, according to plaintiffs. Plaintiffs assert that this bad debt represents the loans to Tyner and William Steinberg. (*Id.* ¶ 38; Bullard First Am. Comp. ¶ ¶ 54, 55)

II.

Berk brings (i) claims under RICO against William Steinberg, Marlene Steinberg, and Tyner; (ii) claims for breach of fiduciary duty under ERISA against all defendants; (iii) claims for breach of fiduciary duty and indemnification or alternatively for breach of contract against all defendants for improper withholding of taxes; (iv) a claim of breach of contract against Tradewell for termination of employment without cause; (v) claims for intentional interference with contract against William and Marlene Steinberg; (vi) a claim for breach of contract against Tradewell for failure to pay commissions

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21664679 (S.D.N.Y.), RICO Bus.Disp.Guide 10,510
**(Cite as: 2003 WL 21664679 (S.D.N.Y.))**

Page 4

properly; (vii) a claim in quantum meruit against Tradewell; (viii) claims for breach of contract and interference with contract against William Steinberg and Tradewell for preventing Berk from earning a commission on a deal involving Microsoft; and (ix) a claim for a judgment voiding the restrictive covenants in Berk's contract.

Tradewell moves, pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), to dismiss Berk's tax claim; claim for commissions to the extent it involves deals that closed after Berk's termination; claim in quantum meruit; claim for commissions on the Microsoft deal; and claim for a declaratory judgment. Tyner moves, pursuant to Rule 12(b)(6), to dismiss the RICO and tax claims.

Bullard brings the following claims: (i) RICO against William Steinberg, Marlene Steinberg, and Tyner; (ii) breach of fiduciary duty under ERISA against all defendants; (iii) breach of fiduciary duty and indemnification or alternatively breach of contract against all defendants for improper withholding of taxes; (iv) breach of contract against Tradewell for termination of employment without cause; (v) intentional interference with contract against William and Marlene Steinberg; (vi) breach of contract against Tradewell for failure to pay commissions properly; (vii) quantum meruit against Tradewell; (viii) a judgment voiding the restrictive covenants in Bullard's contract; and (ix) defamation against William Steinberg and Marlene Steinberg.

Tradewell moves, again pursuant to Rules 12(b)(1) and 12(b)(6), to dismiss Bullard's tax claim; claim for commissions to the extent it involves deals that closed after Berk's termination; claim in quantum meruit; claim for commissions on the Microsoft deal; and claim for a declaratory judgment. Tyner moves, pursuant to Rule 12(b)(6), to dismiss the RICO and tax claims.

**\*5** This court has jurisdiction over both cases under RICO, 28 U.S.C. § § 1964(a), (c) (2000); ERISA, 29 U.S.C. § 1132(e); and, by supplemental jurisdiction, over the state law claims. Both contracts include choice-of-law clauses selecting New York State law. (Berk Contract ¶ 9; Bullard Contract ¶ 9) In their briefs, all parties assume that New York State law applies to the state law claims, and so it does. See *Tehran-Berkeley Civil & Envtl. Eng'rs. v. Tippetts-Abbett-McCarthy-Stratton,* 888 F.2d 239, 242 (2d Cir.1989).

A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985). "On a motion to dismiss, a court must read the complaint generously, and draw all inferences in favor of the pleader." *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *see also California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 515 (1972). The court restricts its inquiry to "facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991); *see also Fed.R.Civ.P. 10(c).*

III.
Tradewell's motions are resolved as follows:

A. *Tax Claims*

Both plaintiffs bring claims against Tradewell for breach of fiduciary duty and indemnification, or alternatively for breach of contract, relating to improper withholding of pay. Both plaintiffs claim that Tradewell issued W-2 forms for 2001 that "materially misstated" the plaintiffs' incomes and amounts withheld from their compensation. (Berk Second Am. Compl. ¶ 55; Bullard First Am. Compl. ¶ 72) Both plaintiffs attempted to correct the errors with the appropriate authorities but are unsure as to whether they were successful. (Berk Second Am. Compl. ¶ 56; Bullard First Am. Compl. ¶ 73) Plaintiffs sue for breach of fiduciary duty and indemnification, or alternatively for breach of contract, for any damages that may arise because of this improper or inaccurate withholding. Plaintiffs' theory for recovery has two parts. First, Tradewell may not have turned over to the government the pay it withheld from plaintiffs. Second, Tradewell may have claimed to have withheld pay for tax purposes but actually just kept the money, thereby breaching the employment contracts.

Regarding plaintiffs' first ground for recovery, for both federal and New York State taxes, the law is clear that an employer who does not turn over withheld pay to the government is responsible for any shortfall; the employee faces no liability. *Slodov v. United States,* 436 U.S. 238, 243 (1978) ("Once net wages are paid to the employee, the taxes withheld are credited to the employee regardless of whether they are paid by the employer, so that the IRS has

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21664679 (S.D.N.Y.), RICO Bus.Disp.Guide 10,510
**(Cite as: 2003 WL 21664679 (S.D.N.Y.))**

Page 5

recourse only against the employer for their payment."); 26 C.F.R. § 1.31- 1(a) ("If the tax has actually been withheld at the source, credit or refund shall be made to the recipient of the income even though such tax has not been paid over to the Government by the employer."); N.Y. Tax Law § 673 (McKinney 2001) ("[A]ny amount of tax actually deducted and withheld under this article in any calendar year shall be deemed to have been paid to the tax commission on behalf of the person from whom withheld, and such person shall be credited with having paid that amount of tax for the taxable year beginning in such calendar year."); In re Anzilotti, DTA No. 8122141996, 1996 N.Y. Tax LEXIS 91, at * 14 (Tax App. Trib. Feb. 22, 1996) ("Tax Law § 673 provides that any amount of tax actually deducted and withheld is deemed to have been paid to the Commissioner of Taxation on behalf of the person from whom withheld and such person is credited with having paid that amount of tax for the tax year. In effect, the section provides a credit to an employee, regardless of whether the employer turns the funds over to the State.").

*6 Plaintiffs' second ground for recovery has not yet hardened into a justiciable controversy. Each plaintiff alleges injury for breach of fiduciary duty and breach of contract "[t]o the extent that the appropriate authorities decline or refuse to recognize the amounts actually withheld from Plaintiff's compensation, as represented on Plaintiffs corrected W-2, and refuse to give plaintiff credit for such amounts." (Berk Second Am. Compl. ¶ 58; Bullard First Am. Comp. ¶ 75) Plaintiffs have not alleged an injury-in-fact, the first element of "the irreducible constitutional minimum of standing." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural" or "hypothetical." " ' Id. (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990) (quoting Los Angeles v. Lyons, 461 U.S. 95, 102 (1983))) (citations omitted). Plaintiffs' alleged injuries are merely hypothetical at this point; they depend on a decision by the appropriate tax-collecting authorities which has not yet been made. The burden is on plaintiffs to allege an injury-in-fact, id. at 561, and they have not met this burden.

Tradewell's motions to dismiss plaintiffs' tax claims are granted.

B. Claims for Breach of Contract for Failure to Pay Commissions

Both plaintiffs bring claims against Tradewell for breach of contract for failure to pay commissions on deals which they generated but which had not closed by the time of their departure from the company. Tradewell contends that these claims must be dismissed because both defendants' contracts do not entitle them to receive commissions on such deals.

In paragraph 1(e)(ii), Berk's contract states: "Employee shall be entitled to a commission payment equal to the applicable percentage of the 'net cash' ... generated from the transactions consummated and closed by Employee." (Berk Contract ¶ 1(e)(ii)) In paragraph 1(e)(iii), it states: "Upon departure from Employer, for any reason, the employee will be eligible to receive commissions only up to 30 days following departure." (Id. ¶ 1(e)(iii)) An attachment to the contract states that "[c]ommission [is] awarded to salesperson assigned account." (Berk Contract, Exhibit "A")

In paragraph 1(e)(ii), Bullard's contract states: "Employee shall be entitled to a commission payment equal to 10% of the 'net cash' generated from merchandise sales on any other 'Key Account.' For purposes of this provision, 'Key Account' means any account that Employee closes individually and remains as an active account executive during the term of the agreement and which management approves as such...." (Bullard Contract ¶ 1(e)(ii)) However, in paragraph 1(e)(v), Bullard's contract states: "Upon departure from Employer, for any reason, the employee will be eligible to receive commissions only up to 30 days following departure." (Id. ¶ 1(e)(v))

*7 Bullard's contract states, in the same paragraph, that Bullard may receive commissions on contracts which he closes and on which he remains the account executive for the duration of the deal, and that Bullard may receive commissions up to 30 days after his departure from Tradewell. Berk's contract has language to the same effect. Berk's contract also suggests that he may be entitled to commissions on any account he was assigned. A contract's language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir.1993) (quoting Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F.Supp. 987, 994

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21664679 (S.D.N.Y.), RICO Bus.Disp.Guide 10,510
(Cite as: 2003 WL 21664679 (S.D.N.Y.))

(S.D.N.Y.1968) (citing _Fox Film Corp. v. Springer,_ _273 N.Y. 434, 8 N.E.2d 23 (1937)_)). Both plaintiffs' contracts are ambiguous as to what plaintiffs must do to earn commissions. Plaintiffs' contracts state that plaintiffs' may receive commissions only on contracts which they close, but plaintiffs' contracts also state that they may receive commissions for contracts that close up to 30 days after their departure. It seems prudent to allow their claims to proceed so that further development of the facts might draw out the contracts' intended meanings.

Apart from the ambiguity of the contracts, there is another reason why plaintiffs' claims should not be dismissed at this point. Tradewell, through its officers, is alleged to have acted in such a way as to make it difficult for plaintiffs to close deals during their employment and, eventually, to have brought that employment to an end, either by explicit termination or by making the workplace completely inhospitable. Under New York law, "every contract contains an implied obligation by each party to deal fairly with the other and to eschew actions which would deprive the other party of the fruits of the agreement." _Greenwich Vill. Assocs. v. Salle,_ 110 A.D.2d 111, 115, 493 N.Y.S.2d 461, 464 (1st Dep't 1985). "A party's actions may implicate the implied covenant of good faith when it acts so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties." _Bank of China v. Chan,_ 937 F.2d 780, 789 (2d Cir.1991). Breach of that implied covenant is treated as breach of the contract. _See_ _Fasolino Foods v. Banca Nazionale del Lavoro,_ 961 F.2d 1052, 1056 (2d Cir.1992). Taking the plaintiffs' allegations at face value and drawing all inferences in their favor, plaintiffs may be able to show that Tradewell violated the implied covenant of good faith.

Both plaintiffs seek money damages; Bullard seeks an accounting as well. A party that sues for an accounting must establish four elements: "(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." _Pressman v. Estate of Steinvorth,_ 860 F.Supp. 171, 179 (S.D.N.Y.1994). Even under the generous standard of a motion to dismiss, Bullard cannot establish the third element. A breach of contract suit for damages provides an adequate legal remedy for any rightfully earned commissions Tradewell did not pay him, and Bullard may use normal discovery

procedures to find out what, if any, commissions he was not paid. Thus, Bullard is not entitled to an accounting. _See_ _Arnold Prods., Inc. v. Favorite Films_ _Corp.,_ 298 F.2d 540, 542-43 (2d Cir.1962) (accounting unnecessary because plaintiff could discover "by means of familiar discovery devices" any information it needed to establish damages, but not reversing the district court because defendant had not objected).

*8 Tradewell's motion to dismiss Berk's claim for breach of contract for failure to pay commissions is denied. Tradewell's motion to dismiss Bullard's claim for breach of contract for failure to pay commissions is granted with respect to Bullard's request for an accounting but denied in all other respects.

### C. _Claims in Quantum Meruit_

In the alternative to their claims for breach of contract for failure to pay commissions, both plaintiffs bring claims in quantum meruit. Tradewell moves to dismiss, arguing that the existence of a valid contract precludes a claim in quantum meruit. This argument misses the point. Although Tradewell is correct that plaintiffs are precluded from recovering under both breach of contract and quantum meruit, they may plead both in the alternative. _Haythe & Curley v. Harkins,_ 214 A.D.2d 361, 362, 625 N.Y.S.2d 154, 155 (1st Dep't 1995).

Once again, Bullard requests an accounting. Bullard is not entitled to an accounting. Bullard's claim in quantum meruit, if successful, will provide him with damages adequate to remedy his loss, and he may avail himself of normal discovery procedures to determine what, if any, commissions he was not paid.

Tradewell's motion to dismiss Berk's claim in quantum meruit is denied. Tradewell's motion to dismiss Bullard's claim in quantum meruit is granted with respect to Bullard's request for an accounting but denied in all other respects.

### D. _Berk's Microsoft Claim_

As noted above, Berk's contract stated that his principal responsibilities and duties included "identifying, generating and closing new business opportunities." (Berk Contract ¶ 1(c)) The contract, by its terms, "set [ ] forth the entire understanding between the parties" and could "not be amended or modified except in a written document signed by Employee and Employer." (_Id._ ¶ 15) Berk claims that he "specifically was responsible for doing deals

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21664679 (S.D.N.Y.), RICO Bus.Disp.Guide 10,510
**(Cite as: 2003 WL 21664679 (S.D.N.Y.))**

in the technology sector" and that Tradewell's senior vice president of sales asked him to work on a deal involving Microsoft. (Berk Second Am. Compl. ¶ 99) Berk claims that Tradewell prevented him from working on a deal with Microsoft that eventually closed and thereby deprived him of a commission. (*Id.* ¶ 98) Berk claims he was "ready and able" to handle the Microsoft deal. (*Id.* ¶ 106)

Berk sues for breach of contract and intentional interference with contract against Tradewell. Tradewell moves to dismiss the claims, arguing that Berk did not work on the Microsoft deal and that Berk's contract did not entitle him to work on the Microsoft deal. Neither party cites any legal authority to support its argument.

New York General Obligations Law § 15-301(1) states that: "A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent." N.Y. Gen. Oblig. Law § 15-301(1) (McKinney 2001). However, this provision does not mean that under New York law contracts with clauses barring oral modification can never be modified except by writing. "[A]part from statute, a contract once made can be unmade, and a contractual prohibition against oral modification may itself be waived." *Rose v. Spa Realty Assocs.,* 42 N.Y.2d 338, 343, 397 N.Y.S.2d 922, 926 (1977) (citation omitted). An oral modification can be enforced when it has "in fact been acted upon to completion" or when "there is partial performance of the oral modification sought to be enforced." *Id.; see also Wechsler v. Hunt Health Sys., Ltd.,* 186 F.Supp.2d 402, 410-12 (S.D.N.Y.2002) (discussing *Rose* ). In this case, the oral modification has neither been acted upon to completion nor even partially performed. Berk was merely "ready and able" to work on the Microsoft deal; he has not alleged that he began working on the deal or expended any resources whatsoever on it.

**\*9** The doctrine of equitable estoppel could provide another route by which Berk might be able to enforce an oral modification to his contract. "Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute to bar proof of that oral modification." *Rose,* 42 N.Y.2d at 344 (citation omitted); *see also Pizza Pub. Co. v. Tricon Global Rests., Inc.,* No. 99 Civ. 12056, 2000 WL 1404716, at \*1-\*2 (S.D.N.Y. Sept. 25, 2000). However, in this case, Tradewell did not induce Berk's "significant and substantial reliance"; Berk was merely "ready and able" to perform pursuant to the modification.

Finally, Berk argues that Tradewell has violated the implied covenant of good faith and fair dealing with regard to the Microsoft deal. As discussed above, a party violates the implied covenant when it acts directly to impair the value of the contract in such a way that its actions may be assumed to be inconsistent with the parties' intent. No such thing is alleged here. Berk's contract did not credit him with a specialty in technology nor grant him exclusivity in that field. Tradewell did not violate the implied covenant by preventing Berk from working on a deal that he had no right to work on.

Accordingly, Tradewell's motion to dismiss Berk's claims against it for breach of contract and interference with contract relating to the Microsoft deal is granted, and the claims are dismissed.

### E. *Declaratory Judgment Claims*

As mentioned above, both plaintiffs' contracts contain covenants against solicitation of employees and customers and against employment by a major competitor. The "COVENANT AGAINST SOLICITATIONS OF EMPLOYEES AND ACTUAL OR POTENTIAL CUSTOMERS," identical in the two contracts, states that, during the term of employment and for two years afterwards, the employee may not, without Tradewell's express written consent, solicit customers, suppliers, employees, and selected others in any manner that interferes or might interfere with Tradewell's business. The employee also may not hire any Tradewell employee for a job in Tradewell's line of business. (Berk Contract ¶ 5; Bullard Contract ¶ 5) The covenant against employment by a major employer, which is substantially similar in both plaintiffs' contracts, states that the employee may not work for or become associated with any of Tradewell's named competitors for a period of one year after termination of his employment with Tradewell. (Berk Contract ¶ 6; Bullard Contract ¶ 6)

Both plaintiffs brings claims for a declaratory judgment that the covenants are void, unenforceable, and nonbinding and for an injunction against Tradewell's bringing an action against the plaintiffs based on the covenants. Bullard states that he "wishes to begin a new business venture or find a new job in

the industry." (Bullard First Am. Compl. ¶ 115) Berk merely states that he "wishes to begin a new business venture." (Berk Second Am. Compl ¶ 116) Both plaintiffs say Tradewell has threatened to enforce the covenants by legal action. (*Id.* ¶ 115; Bullard First Am. Compl. ¶ 116)

**\*10** Both plaintiffs argue that the covenant against employment by a major competitor is unenforceable for several reasons. However, that covenant binds the plaintiffs for only one year after the termination of their employment at Tradewell. More than a year has passed since either plaintiff was employed at Tradewell. The passage of time has raised an issue of mootness, which this court may reach sua sponte. *See North Carolina v. Rice*, 404 U.S. 244, 246 (1971). The test for mootness is the same as that for standing, *see United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980), to wit: "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). Given the clear language of the covenant and the expiration of its time limit, there is no longer a substantial controversy regarding the covenant against employment by a major competitor. Therefore, both plaintiffs' claims for declaratory relief on the covenant against employment by a major competitor are dismissed. Plaintiffs' claims for injunctive relief on the same covenant are moot also, and they are dismissed as well.

Tradewell moves to dismiss for lack of jurisdiction both plaintiffs' claims for declaratory relief on the covenant against the solicitation of employees and customers. As Tradewell states in its papers, the test is that quoted above from *Maryland Casualty Co.* In Bullard's case, as he "wishes to begin a new business venture or find a new job in the industry" and Tradewell has threatened to commence legal action, he has alleged a substantial controversy of sufficient immediacy and reality to invoke this court's jurisdiction. Tradewell's motion to dismiss is denied with regard to Bullard. Berk merely "wishes to begin a new business venture," and he alleges that Tradewell has threatened him with legal action as well. Berk does not allege that he wishes to begin a venture in Tradewell's field or in any related field. Therefore, he does not allege proposed conduct that interferes or might interfere with Tradewell's business and provides no reason for the court to believe that he may be in a position to hire any Tradewell employee for a job in Tradewell's line of business. Thus, Berk does not allege a substantial controversy that this court may adjudicate. Tradewell's motion to dismiss Berk's claim for a declaratory judgment regarding the covenant against the solicitation of employees and customers is granted.

IV.

Tyner's motions are resolved as follows:

### A. *Tax Claims*

Both plaintiffs bring the tax claims described in section III.A above against Tyner as well. Tyner moves to dismiss. For the reasons stated above, Tyner's motion to dismiss is granted, and both plaintiffs' tax claims are dismissed.

### B. *RICO Claims*

**\*11** Both plaintiffs bring civil RICO claims against Tyner, alleging that she conspired to defraud them through a pattern of racketeering activity as described in section I of this opinion. Plaintiffs bring their claims under 18 U.S.C. § 1964(c), which extends a right to sue to "[a]ny person injured in his business or property by reason of a violation of section 1962" of Title 18 of the United States Code. 18 U.S.C. § 1964(c) (2000). Section 1962 sets out four grounds for a civil RICO lawsuit in subsections (a) through (d). Plaintiffs have not specified under which subsection of § 1962 they claim injury. Tyner moves to dismiss, arguing that plaintiffs have failed to plead a claim under the RICO statute.

To state a claim under civil RICO, a plaintiff must plead seven elements: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983). This Court has been mindful of potential abuse of the RICO statute. *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y., 1996) ("Because the 'mere assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants, ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." ' (quoting *Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir.1990))).

Section 1962 lists four grounds for injury under civil RICO. Paragraph (a) states:

Not Reported in F.Supp.2d
2003 WL 21664679 (S.D.N.Y.), RICO Bus.Disp.Guide 10,510
(Cite as: 2003 WL 21664679 (S.D.N.Y.))

Page 9

"It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, in acquisition of any interest in, or the establishment of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

18 U.S.C. § 1962(a) (2000). It is the law of this Circuit that a plaintiff must allege a particular "investment injury," an injury caused by the defendant's investment of racketeering income, to plead an injury under § 1962(a). *Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir.1990) ("[B]ecause the conduct constituting a violation of § 1962(a) is investment of racketeering income, a plaintiff must allege injury from the defendant's investment of the racketeering income to recover under § 1962(a).") Here, plaintiffs allege no such investment injury, so § 1962(a) cannot provide the basis for their claim.

Paragraph (b) states: "It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." As with § 1962(a), a violation of § 1962(b) requires a specific type of injury to be actionable under § 1964(c): an "acquisition" or "maintenance" injury. *Discon Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir.1996), vacated on other grounds, 525 U.S. 128 (1998); *Kaczmarek v. IBM Corp.*, 30 F.Supp.2d 626, 629 (S.D.N.Y.1998). This injury must also be distinct from the injury caused by the RICO predicate acts. *Discon*, 93 F.3d at 1063; *Kaczmarek*, 30 F.Supp.2d at 629.

**\*12** Just as they failed to allege investment injury under § 1962(a), plaintiffs have alleged neither acquisition nor maintenance injuries under § 1962(b).

Paragraph (c) states: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." Plaintiffs would seem to have adequately pleaded injury under § 1962(c), but they allege mail and wire fraud as the predicate acts under RICO, and Tyner argues that they have not pleaded these offenses with the particularity required by Rule 9(b).

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The Second Circuit has held that a "complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). Plaintiffs must identify the purpose of the mailings within the fraudulent scheme, *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir.1992), and must "allege facts that give rise to a strong inference of fraudulent intent," *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994).

However, "there is no bright line rule for deciding whether a complaint had satisfied Rule 9(b)." *Int'l Motor Sports Group, Inc. v. Gordon*, No. 82709, No. 98 Civ. 5611, 1999 WL 619633, at \*3 (S.D.N.Y. Aug. 16, 1999) (quoting *I.M. Oberman Associates v. Republic Financial Services, Inc.*, No. 92 Civ. 1843, 1993 WL 88209, at \*2 (S.D.N.Y. Mar. 25, 1993)). Rule 9(b) contemplates three policy goals: "(1) providing a defendant fair notice of plaintiff's claim, to enable preparation of his defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits." *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir.1987). Rule 9(b) should not be applied in such a way as to exalt these goals above all else. "Indeed, in analyzing the sufficiency of a pleading under Rule 9(b), a district court must balance the rule with both Fed.R.Civ.P. 8(a), which requires only a 'short and plain statement' of the claims for relief, and Fed.R.Civ.P. 8(f), which provides that 'all pleadings shall be construed as to do substantial justice.' " *Int'l Motor Sports Group*, 1999 WL 619633, at \*3; *see also Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 n. 20 (2d Cir.1979). Thus, as this court has stated before, "a plaintiff need not plead dates, times and places with absolute precision, so long as the complaint 'gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based." ' *Int'l Motor Sports Group*, 1999 WL 619633, at \*3 (quoting *Spear, Leeds & Kellogg v. Public Service Co.*, 700 F.Supp. 791, 793 (S.D.N.Y.1988)).

**\*13** Furthermore, the facts of this case raise additional considerations which provide a compelling argument that the plaintiffs have met their pleading burden under Rule 9(b). First, as plaintiffs have

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21664679 (S.D.N.Y.), RICO Bus.Disp.Guide 10,510
(Cite as: 2003 WL 21664679 (S.D.N.Y.))

alleged, the documents necessary to plead the scheme with greater particularity are in the possession of the defendants, including Tyner. The Second Circuit and courts in this district frequently have found that exclusive possession of the relevant information by the defendant is a ground for reading Rule 9(b)'s requirements permissively. E.g., ABF Capital Mgmt. v. Askin Capital Mgmt., L.P., 957 F.Supp. 1308, 1327 (S.D.N.Y.1997) ("[I]t is particularly appropriate to ease the pleading burden under Rule 9(b) when information is within the exclusive control of the defendant."); see also, e.g., Degulis v. LXR Biotechnology, Inc., 928 F.Supp. 1301, 1311 (S.D.N.Y.1996) ("Fraud allegations may be based upon information and belief as to facts peculiarly within the opposing party's knowledge. Where manipulation is alleged, as opposed to affirmative misrepresentation, some or all of the facts may be in the control of the defendants and inaccessible to the plaintiffs without discovery. Moreover, in cases of corporate fraud, the requirements of Rule 9(b) are relaxed as to matters particularly within the opposing party's knowledge." (citations omitted)); Giuliano v. Everything Yogurt, Inc., 819 F.Supp. 240, 244 (S.D.N.Y.1993). Second, Tyner is a corporate insider, and Rule 9(b) is applied more leniently to complaints against corporate insiders. Allen v. New World Coffee, Inc., No. 00 Civ. 2610, 2001 WL 293683, at *4 (S.D.N.Y. Mar. 27, 2001).

In their complaints, plaintiffs **plead a complex fraud** and provide numerous details as to how it worked in **particular** instances. Plaintiffs allege that Tyner is in possession of further information concerning the fraud, and Tyner is a corporate insider. Plaintiffs have provided Tyner with sufficient notice of the fraud claims to satisfy the requirements of Rule 9(b).

Tyner argues also that plaintiffs have failed to plead continuity sufficiently to satisfy the RICO statute. Section 1961(5) defines a "pattern of racketeering activity" as "requir[ing] at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5) (2000). A pattern of racketeering activity must be continuous in either an open-ended or closed-ended fashion. Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir.1999). In H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989), the Supreme Court stated that open-ended continuity exists "where it is shown that the predicates are a regular way of conducting

defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes)." Id. at 243. Plaintiffs have made extensive claims that the RICO predicate acts they allege infiltrated the normal operation of Tradewell, a business that existed for non-criminal purposes. Thus, they have pleaded continuity sufficiently. Because I have found open-ended continuity to be pleaded sufficiently, I need not address closed-ended continuity.

*14 Finally, paragraph (d) states that it "shall be unlawful for any person to conspire to violate any of the provisions of" § 1962(a)-(c). 18 U.S.C. § 1962(d) (2000). I have found that plaintiffs have alleged violation of § 1962(c) by Tyner. Plaintiffs have alleged also that Tyner and the Steinbergs formed an agreement and acted in concert to commit the frauds discussed above. Therefore, plaintiffs have pleaded a claim under § 1962(d) as well.

Tyner's motion to dismiss both plaintiffs' RICO claims is granted as to claims under 18 U.S.C. § 1962(a)-(b) but denied in all other respects.

\* \* \*

For the reasons set forth above, defendants' motions to dismiss are resolved as follows: (i) Tradewell's and Tyner's motion to dismiss both plaintiffs' tax claims are granted; (ii) Tradewell's motion to dismiss Berk's claim for breach of contract for failure to pay commissions is denied; (iii) Tradewell's motion to dismiss Bullard's claim for breach of contract for failure to pay commissions is granted with respect to Bullard's request for an accounting but denied in all other respects; (iv) Tradewell's motion to dismiss Berk's claim in quantum meruit is denied; (v) Tradewell's motion to dismiss Bullard's claim in quantum meruit is granted with respect to Bullard's request for an accounting but denied in all other respects; (vi) Tradewell's motion to dismiss Berk's claims for breach of contract and interference with contract relating to the Microsoft deal is granted; (vii) Tradewell's motion to dismiss both plaintiffs' claims for declaratory and injunctive relief on the covenant against employment by a major competitor is granted; (viii) Tradewell's motion to dismiss Bullard's claim for a declaratory judgment regarding the covenant against the solicitation of employees and customers is denied; (ix) Tradewell's motion to dismiss Berk's claim for a declaratory judgment regarding the covenant against the solicitation of employees and customers is granted; and (x) Tyner's motion to dismiss both plaintiffs' RICO claims is

Not Reported in F.Supp.2d
2003 WL 21664679 (S.D.N.Y.), RICO Bus.Disp.Guide 10,510
**(Cite as: 2003 WL 21664679 (S.D.N.Y.))**

Page 11

granted as to claims under 18 U.S.C. § 1962(a)-(b)
but denied in all other respects.

  SO ORDERED:

2003    WL    21664679    (S.D.N.Y.),    RICO
Bus.Disp.Guide 10,510

Motions, Pleadings and Filings (Back to top)

-      1:01CV10068 _ _ _ _ _(Docket)
(Nov. 14, 2001)

-      1:01CV09035 _ _ _ _ _(Docket)
(Oct. 10, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Date of Printing: SEP 20,2004

## KEYCITE

**C** **Berk v. Tradewell, Inc.,** 2003 WL 21664679, RICO Bus.Disp.Guide 10,510 (S.D.N.Y., Jul 16, 2003) (NO. 01 CIV. 9035 (MBM), 01 CIV. 10068 (MBM))

### History

=>    1    **Berk v. Tradewell, Inc.,** 2003 WL 21664679, RICO Bus.Disp.Guide 10,510 (S.D.N.Y. Jul 16, 2003) (NO. 01 CIV. 9035 (MBM), 01 CIV. 10068 (MBM))

### Court Documents
### Dockets (U.S.A.)

**S.D.N.Y.**

2    BERK v. TRADEWELL, INC., ET AL, NO. 1:01CV09035 (Docket) (S.D.N.Y. Oct. 10, 2001)

3    BULLARD v. TRADEWELL, INC., ET AL, NO. 1:01CV10068 (Docket) (S.D.N.Y. Nov. 14, 2001)

© Copyright 2004 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.